EUGENE FULTZ, Plaintiff-Appellee, v. KENNETH A. PEART *et al.*, Defendants-Appellants (SIMC, Inc., d/b/a Marco Pharmacy, Defendant).

Fifth District   No. 5—84—0434

Opinion filed June 9, 1986.

Donald V. Ferrell, of Jelliffe, Ferrell & Morris, of Harrisburg, and Eric W. Springer and Linda Haddad, both of Horty, Springer & Mattern, P.C., of Pittsburg, Pennsylvania, for appellants Kenneth A. Peart and Southern Illinois Clinic, Ltd.

Dennis E. Rose, of Donovan, Hatch & Constance, P.C., of Belleville, for appellant SIMC, Inc.

George C. Lackey, of Lackey, Warner & Sauer, P.C., of Centralia, and Gerald L. Montroy and Charlene E. Novick, both of Carr, Korein, Kunin, Schlichter & Brennan, of East St. Louis, for appellee.

JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Eugene Fultz, brought suit in the circuit court of Jefferson County alleging that defendant, SIMC, Inc., doing business as Marco Pharmacy (Pharmacy), was negligent in filling his prescription with the wrong medication, that defendant Dr. Kenneth A. Peart and defendant Southern Illinois Clinic, Ltd. (Clinic), were negligent in providing medical treatment and that defendants' negligent actions were

the proximate cause of plaintiff's illness and stroke. The jury returned verdicts for the plaintiff and against all defendants. Defendants Dr. Peart and Clinic appeal. Defendant Pharmacy is not a party to this appeal.

On Friday, June 20, 1980, plaintiff's wife went to defendant Pharmacy to refill his prescription for Dymelor, an oral medication for the control of diabetes mellitus. Originally diagnosed as a noninsulin-dependent diabetic in 1969 or 1970, Fultz' disease had been under control for approximately 10 years. Maintaining control of noninsulin-dependent diabetes requires a careful balancing of daily food and insulin requirements. Dymelor stimulates an underproducing pancreas to produce a sufficient amount of insulin. Generally, Fultz took five Dymelor tablets a day.

At the Pharmacy, Fultz' Dymelor prescription bottle was filled with Aldomet, a prescription drug used to reduce blood pressure in individuals suffering from high blood pressure. Aldomet tablets are a slightly different color, shape and size from Dymelor tablets. In taking Aldomet instead of Dymelor, Fultz was not producing sufficient insulin to maintain control of his diabetes and he was receiving an Aldomet dosage significantly greater than the maximum recommended dosage for an individual suffering from high blood pressure. Fultz did not suffer from high blood pressure.

Within 24 hours, Fultz began experiencing chills, shakes, drowsiness and a general decrease in appetite. These symptoms continued through June 24, 1980, when Fultz felt too ill to go to work and contacted defendant Clinic to make an appointment with his physician. Fultz was informed that his physician was on vacation and was referred to Dr. Peart, also a Clinic employee. Fultz saw Dr. Peart on the morning of June 24, 1980.

During the office visit, Fultz complained of chills, shakes, dizziness, fatigue and seeing bright flashing lights. Dr. Peart conducted a clinical examination which revealed that Fultz had a slight fever and a blood pressure of 100/60. Although a blood pressure of 100/60 is low for a man of Fultz' age and general medical condition, it is still within the normal range. Fultz' pulse rate was 140 which is quite rapid. Normal pulse rates range between 60 and 80. A blood count revealed no infection. Based on Fultz' diabetic history, Dr. Peart ordered a blood sugar test which revealed a blood sugar level of 307 milligrams per deciliter. Normal blood sugar levels range from 65 to 110 milligrams per deciliter. Dr. Peart diagnosed Fultz as suffering from diabetes out of control with a fever of unknown origin and suggested hospitalization to conduct additional tests and to reestablish control of his diabetes. Neither

Dr. Peart nor Fultz were aware that Fultz had been receiving the wrong medication.

Fultz was admitted to Good Samaritan Hospital in Mt. Vernon, Illinois, on June 24, 1980, where additional tests were performed. Dr. Peart ordered blood sugar level and ketone body checks four times per day. The first two tests performed on June 24, 1980, revealed blood sugar levels of four plus on a scale of zero to four and were negative for ketone bodies. A four-plus blood-sugar level indicates diabetes out of control. Test results negative for ketone bodies indicates that Fultz was not in ketoacidosis, a breakdown of body fats which results in diabetic coma. The third test was three plus on a scale from zero to four for ketone bodies which is an indication of dehydration. An electrolytes balance test was normal, which is an indication that Fultz was not suffering from dehydration. A lipid profile indicated that his triglycerides were quite elevated. High triglycerides are consistent with the diagnosis of diabetes out of control. All other tests returned normal findings.

On June 25, 1980, Fultz' wife realized that the development of his symptoms coincided with the recent refill of his Dymelor prescription and that he had mentioned the refill pills were a slightly different shape from his previous pills. Suspecting the possibility of a medication error, she took some of the pills to the hospital on June 26, 1980, when she went to visit her husband. Dr. Peart identified the pills as Aldomet, a prescription medication for high blood pressure, and indicated that he would contact defendant Pharmacy concerning the prescription refill. Dr. Peart did not inform Fultz of his ownership interest in defendant Pharmacy. June 26, 1980, is the first time the parties knew there had been a medication error.

In the hospital, Fultz was removed from all medication and placed on a controlled diabetic diet and a sliding scale of insulin to determine his daily insulin requirement. Although his blood sugar level continued to drop, it remained above the normal range. By July 3, 1980, the date of his release, Fultz' blood sugar level of 155 was still above normal, but Dr. Peart considered it an acceptable level to allow discharge. Throughout his hospitalization, Fultz' blood pressure remained consistently low. Although within the generally accepted normal range, it was notably low for a man of his age and medical history. Additionally, his past blood pressure readings had been significantly higher. No additional tests were performed to determine the reason for his consistently low blood pressure, and on the date of release, Fultz' blood pressure was 98/60, the lowest it had been since he entered the hospital.

On the morning of July 3, 1980, Fultz was released from the hospital. Sometime late that evening or early the next morning, Fultz suf-

fered a cerebral infarction, or stroke, resulting in a permanent loss of function to his right side, disorientation, and general debility. A CT scan revealed that a major area of his left frontotemporal lobe had been destroyed. Plaintiff's disabilities include partial paralyzation of parts of the right side of his body and the left side of his face, difficulty in speaking, memory tending to fade as he speaks and inability to perform even simple manual labor. He was readmitted to Good Samaritan Hospital under the care of Dr. Trivedi.

A cerebral infarction, more commonly called a stroke, is the death of brain tissue by one of three general mechanisms, all of which involve depriving the brain of an adequate blood supply and the oxygen it carries. Central nervous system tissue, of which the brain is a major portion, is extremely sensitive to oxygen deprivation. If the brain is completely deprived of oxygen for more than four minutes, a person will die. In a stroke, a portion of the brain is deprived of oxygen long enough for tissue death to occur. Brain tissue is unique in that it has no capacity for regeneration. Although post-stroke recovery is possible, such recovery involves utilizing undamaged cells or relearning, not the healing of damaged cells.

An elementary understanding of the different types of stroke is necessary in this case. There are three types of stroke: hemorrhagic, embolic and thrombotic. A hemorrhagic stroke results from the rupture of a blood vessel or aneurysm. Brain tissue normally supplied by the ruptured vessel is deprived of its blood supply and dies. Hemorrhagic strokes are rare and sudden in onset with little or no prewarning. All parties agree that Fultz did not suffer a hemorrhagic stroke. In an embolic stroke, a small embolus, a free-floating piece of plaque, lipid or blood clot, breaks loose from somewhere else within the circulatory system and eventually lodges in a smaller vessel, thus depriving brain tissue of its blood supply. Medical conditions that predispose an individual to an embolic stroke include phlebitis, heart murmurs, atrial fibrillation and arteriosclerosis. Embolic strokes occur suddenly with no forewarning. Fultz was suffering from arteriosclerosis wherein the blood vessel walls become less elastic and the diameter is narrowed because of deposits of cholesterol, and defendants contend that he suffered an embolic stroke which they could neither predict nor prevent. A thrombotic or occlusive stroke occurs when a blood vessel closes off because of a collapse in the vessel, a build up of lipids (fatty deposits) or plaque, or the formation of a blood clot which prevents the passage of blood. A thrombotic stroke develops gradually and is often indicated by transient ischemic attacks (TIA's). A TIA is the transient loss of neurologic function and occurs because the blood vessel is narrowing

and the brain is not receiving enough blood to function at 100%, but it is receiving enough blood to keep the tissue alive. Because the area of the brain that is not being completely profused with blood is the same area that will be damaged by any thrombotic stroke, the accompanying TIA's are evidenced by short-term losses in the same functions. TIA's may be evidenced by garbled speech, behavior changes, and paralyzation or weakness. Plaintiff contends that he suffered a thrombotic stroke which defendants could have prevented with proper medical treatment.

Fultz brought suit asserting that defendant Pharmacy negligently refilled the prescription with the wrong medication and that defendants Dr. Peart and Clinic provided substandard medical care and that these actions were the proximate cause of his stroke. Fultz claimed that if defendant Pharmacy had properly refilled the prescription, he would not have suffered the stroke and that if defendants Dr. Peart and Clinic had properly treated him with intravenous fluids (IV fluids), he would not have suffered the stroke. Two expert medical witnesses testified for Fultz.

Dr. Howard Schwartz, director of emergency medical services at St. Louis County Hospital, a board certified toxicologist who teaches at St. Louis University Medical School, testified for Fultz. Dr. Schwartz testified that, based on a review of the hospital records, plaintiff's exhibits 1, 2, and 3, Dr. Peart failed to meet the standard of care required of a physician in providing care and treatment to a diabetic presenting Fultz' symptomatology. Based on the signs, symptoms, and tests given, Dr. Schwartz testified that plaintiff was dehydrated when he entered the hospital on June 24, 1980, and that he was still dehydrated when he was discharged nine days later on July 3, 1980. Dr. Schwartz testified that any diabetic out of control is dehydrated and that the effect of taking a blood pressure reducing medication like Aldomet would be to increase that dehydration. The records show that Fultz had an elevated urine specific gravity, rapid pulse, abnormally low blood pressure for a man of his age and medical history, and fever, all indications of dehydration. Dr. Schwartz testified that this prolonged period of dehydration resulted in a reduction of the actual volume of blood in Fultz' circulatory system, and insufficient blood volume combined with the lowered blood pressure to cause clotting of blood vessels in the brain which, in turn, resulted in a thrombotic stroke. Normally, blood within the blood stream remains liquid and does not clot; however, when there is low blood volume and low blood pressure, clotting can occur. Dr. Schwartz testified that failure to provide IV fluids deviated from both the proper national standard of care

and from the standard of care in southern Illinois as he knew it. Dr. Schwartz further testified that had IV fluids been administered to replace lost fluids, the medical probability is that the stroke would not have occurred. Additionally, Dr. Schwartz testified that releasing Fultz on July 3, 1980, was a deviation from the proper standard of care since Fultz' blood pressure on that date was at its lowest recorded reading. Finally, based on hypothetical questions, Dr. Schwartz testified that TIA's would have been additional indications of low blood volume and low blood pressure resulting in poor profusion of the brain and the potentiality of a thrombotic stroke. Dr. Schwartz noted that the symptomatology as reported by plaintiff's wife were TIA's consistent with plaintiff's eventual stroke damage.

Dr. Harvey Liebhader, plaintiff's current treating physician, also testified as an expert medical witness. Dr. Liebhaber, also from St. Louis, Missouri, is currently in private practice and specializing in internal medicine. The treatment of diabetics and stroke victims is a substantial portion of his practice. During his professional career, Dr. Liebhaber has field faculty positions at several major medical schools. Dr. Liebhaber testified extensively concerning the relationship of diabetes out of control and dehydration. Dr. Liebhaber testified that dehydration was indicated by the three-plus ketone-body findings, the very low blood pressure, the elevated sugar levels and other factors including the rapid pulse rate. When a diabetic is out of control, his body cannot utilize sugar for energy. Excessive amounts of sugar accumulate in the blood and are flushed out of the body as it passes through the kidneys. The diabetic becomes dehydrated because in order to pass the sugar out of the body, each molecule of sugar must attach to a molecule of water that would otherwise be retained within the body. With dehydration, the blood volume contracts and the blood pressure goes down. In a diabetic suffering from arteriosclerosis the blood vessels are rigid and cannot contract to help maintain blood pressure. Thus, a diabetic is less able to properly cope with major fluctuations in blood pressure. Relying on the hospital records, Dr. Liebhaber testified that Dr. Peart's care was substandard in that failure to administer IV fluids allowed Fultz' blood pressure to remain too low for too long. Dr. Liebhaber testified that additional indications of Dr. Peart's failure to follow both nationally recognized standards in the care of a diabetic out of control and in the standard within southern Illinois, as known by his contacts with physicians consulting in that area, include the failure to conduct a neurological examination, the failure to conduct a serum ketone to determine accurate sugar levels and the failure to check for evidence of TIA's. Based on information provided by plaintiff's wife,

Dr. Liebhaber testified that during his hospitalization, Fultz was experiencing TIA's which manifested as behavior changes, mumbling, staring off into space, and not hearing conversations directed at him. Dr. Liebhaber testified that Fultz suffered a thrombotic stroke which could have been prevented by proper medical treatment. Additionally, Dr. Liebhaber testified that, in his opinion, it would have been impossible for Fultz to have suffered an embolic stroke since the only indication of arteriosclerosis was over the right carotid artery and plaque from that area could not have caused damage to the left hemisphere of the brain.

Dr. Samuel Bernstein, the executive director of Jewish Employment and Vocational Service, a comprehensive vocational rehabilitation agency, testified for plaintiff concerning his employability and the extent of his disability. Dr. Bernstein conducted extensive testing and interviewing and determined that plaintiff was unemployable, with no future prospects of employability. Dr. Bernstein further testified that plaintiff was totally and permanently disabled.

Defendant Pharmacy presented one expert witness as to the drug Aldomet, its usage, symptomatology of overdose, and his opinion as to the relationship between the drug and plaintiff's stroke. As defendant Pharmacy is not a party to this appeal, no additional detail as to the expert witness' testimony is necessary.

Defendants Dr. Peart and Clinic presented no independent expert medical witnesses. Dr. Peart testified as to his opinions and the care he provided plaintiff. He testified that Fultz was not dehydrated, did not require IV fluids and that there was no evidence of TIA's. In his opinion, Fultz suffered an embolic stroke as a result of the dislodging of a piece of arteriosclerosis plaque from his left carotid artery. Additional witnesses for defendants included four treating nurses who testified that they did not notice any TIA's; one of Fultz' business associates who saw him on July 3, 1980, and testified that he did not notice any indications of TIA's; and Dr. Pritam S. Sahni, also an employee of defendant Clinic, who testified as a post-stroke occurrence witness.

The jury found all defendants guilty of negligence and assessed Fultz' damages at $1,689,641 against defendant Pharmacy reduced by 15% for contributory fault and at $1,689,641 against defendants Dr. Peart and Clinic. The trial court entered judgment against defendant Pharmacy in the amount of $1,436,195, and against defendants Dr. Peart and Clinic in the amount of $1,689,641. As noted earlier, defendant Pharmacy is not a party to this appeal.

Defendants Dr. Peart and Clinic raise numerous issues on appeal: whether the trial court erred in denying defendant's motions for di-

rected verdicts; whether the trial court erred in denying defendants' motions for judgment notwithstanding the verdict; and whether the jury's verdict was contrary to the law and to the manifest weight of the evidence in that the trial court erred in certain evidentiary rulings, which resulted in an excessive award of damages, rulings on the conduct of plaintiff's counsel, in instructing the jury, and in not sending certain exhibits to the jury room. Defendants seek a reversal or a new trial. In the alternative defendants contend that the trial court erred in failing to enter the judgment in a form constituting joint and several liability and in denying defendants' motions seeking setoff for partial satisfaction of the judgment. Under the alternative argument, defendants seek a remand with instructions to correct the form of the judgment and allow setoff for the partial satisfaction paid to plaintiff by defendant Pharmacy.

Initially, defendants contend that the trial court erred in denying motions for directed verdicts presented at the close of plaintiff's case and at the close of defendants' case and that the trial court erred in denying motions for judgment notwithstanding the verdict. Defendants argue that plaintiff failed to sustain his burden of proof in that he did not present expert medical testimony from witnesses who qualified under the locality rule. Additionally, defendants argue that the testimony of plaintiff's experts was not credible and was contrary to the medical records and evidence.

Defendants are entitled to a directed verdict or a judgment notwithstanding the verdict only when all the evidence, viewed in the light most favorable to plaintiff, so overwhelmingly favors the defendants that no contrary verdict based upon that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) When the evidence supports the verdict, the judgment will stand. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 190, 417 N.E.2d 1322, 1324-25.

■ Bearing these principles in mind, we must first address the issue of whether plaintiff's expert medical witnesses were qualified to testify under the Illinois similar locality rule "whereby a doctor is bound to exercise such care and diligence as a good practitioner in a same or similar community would under same or similar circumstances." (*Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 544, 490 N.E.2d 181, 185.) Plaintiff's experts must demonstrate a familiarity with the standard of care under the similar locality rule prior to testifying as to the standard of care by which defendants' conduct is to be measured, the negligent or wilful failure to meet that standard, and the fact that the failure to meet the standard was the proximate cause

374

of plaintiff's injury. (141 Ill. App. 3d 538, 543-44, 490 N.E.2d 181, 185; *Carter v. Dunlop* (1985), 138 Ill. App. 3d 58, 61, 484 N.E.2d 1273, 1276.) While the meaning of the term "locality" varies with the particular facts of the case (*Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 722, 490 N.E.2d 1004, 1007; *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 545, 490 N.E.2d 181, 186; *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 481, 473 N.E.2d 1322, 1339; *Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 108, 399 N.E.2d 238, 246), recent Illinois decisions direct that the applicable locality should be narrowed no further than necessary to accomplish the goals of the rule (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 247, 489 N.E.2d 867, 874-75; *Duvall v. Laidlaw* (1986), 141 Ill. App. 3d 717, 722, 490 N.E.2d 1004, 1007; *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 545, 490 N.E.2d 181, 186). "If a plaintiff's expert is familiar with the standards of care applicable to conditions and facilities available to the defendant doctor, then he is qualified to testify. If *** there are certain uniform standards that would be applicable to a given situation regardless of the locality, then the lack of familiarity with the practice in a particular locality will not disqualify the expert. However, if conditions and facilities that are available are relevant, then before an expert can express an opinion as to a physician's conduct, he must be acquainted with accepted standards of care under similar circumstances." *Purtill v. Hess* (1986), 111 Ill. 2d 229, 247, 489 N.E.2d 867, 874-75.

The defendants challenge the testimony of Dr. Schwartz and Dr. Liebhaber on the ground that neither is familiar with the standard of care applicable in southern Illinois, particularly in Mt. Vernon, Illinois.

■ While both Dr. Schwartz and Dr. Liebhaber practice in the metropolitan area of St. Louis, Missouri, and are affiliated with major hospitals and medical schools, they both testified that they were generally familiar with the standards of care of a diabetic out of control in southern Illinois through contacts with other professionals. Furthermore, both experts testified that diabetes is not an uncommon disease and that there is a national standard of care for the treatment of diabetics out of control. Both experts testified that any diabetic out of control is losing fluids and is dehydrated. According to the testimony of both experts, administration of IV fluids to a diabetic out of control is standard practice throughout the country. Finally, both experts testified that IV fluids are standard therapy available in every hospital. Our review of the record indicates that plaintiff's expert medical witnesses were qualified to testify under the similar locality rule.

Defendants have also challenged the credibility of plaintiff's expert medical witnesses. Defendants argue that the medical evidence does

not support the opinions of plaintiff's experts, but that the testimony of their occurrence witnesses renders the opinions of plaintiff's experts unworthy of belief.

■ The credibility of various witnesses and the weight to be given testimony and evidence are issues properly given to the jury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424, 328 N.E.2d 301, 305.) In challenging the testimony of plaintiff's experts, defendants rely on *Pedrick*. Our review of the evidence, as heretofore set out in great detail, reveals no reason to reverse the decision of the jury because of failure of proof on the part of plaintiff.

■ Defendants next contend that the trial court erred in limiting the testimony of Dr. Sahni to that of an occurrence witness and prohibiting him from expressing his opinion as an expert witness as to the cause of plaintiff's stroke. Defendants argue that because plaintiff's Exhibit 2 placed Dr. Sahni's opinion into evidence without limitations on the use thereof, they should have been allowed to question Dr. Sahni as to his opinion in order to rebut the testimony of plaintiff's medical expert witnesses. In essence, defendants argue that they should have been allowed to bolster Dr. Sahni's opinion, which was that plaintiff had suffered an embolic stroke, even though they had failed to disclose him as an expert, one would suppose because he was an associate of Dr. Peart in the Clinic.

Plaintiff contends that the trial court properly ruled on the admissibility of Dr. Sahni's testimony. On April 25, 1983, the trial court entered an order requiring the disclosure of any expert witnesses on or before July 31, 1983. The same order set the trial date for October 18, 1983. Defendants did not respond to plaintiff's motions for disclosure of expert witnesses, nor to the order of April 25, 1983. Furthermore, in answers to interrogatories, defendants disclosed Dr. Sahni as a post-occurrence witness, not as a potential expert witness. Plaintiff argues that allowing Dr. Sahni to testify as an expert witness would have resulted in unfair surprise inasmuch as defendants did not propose to call Dr. Sahni as an expert until day 9 of a 10-day trial.

Section 2—1003(c) of the Code of Civil Procedure provides that "[a] party shall not be required to furnish the names or addresses of his or her witnesses, except that upon motion of any party disclosure of the identity of expert witnesses shall be made to all parties and the court in sufficient time in advance of trial so as to insure a fair and equitable preparation of the case by all parties." (Ill. Rev. Stat. 1983, ch. 110, par. 2—1003(c).) Pursuant to Supreme Court Rule 218, the trial court has the power to limit the number of expert witnesses (87 Ill. 2d R. 218(a)(4)) and to enter other orders to aid in the disposition of

the action (87 Ill. 2d Rules 218(a)(5), 218(b)). The trial court also has the power to impose sanctions for failure to comply with such orders (*Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 368, 459 N.E.2d 940, 948), including the power to prevent a witness from testifying on certain issues (87 Ill. 2d R. 219(c)(iv)). In determining an appropriate sanction, the trial court must consider the following factors: surprise to the adverse party, the prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party and any lack of good faith. *Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 369-71, 459 N.E.2d 940, 948; *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 480-81, 483 N.E.2d 711, 720.

Expert testimony with respect to standard of care and proximate cause is essential both to the prosecution and defense of medical malpractice cases. Adequate trial preparation requires timely disclosure of expert witnesses. Time is needed prior to trial to investigate the credentials of proposed expert witnesses and to discuss the substance of the expert's testimony with one's own experts in order properly to prepare for cross-examination. Mere disclosure of the names of occurrence witnesses is not the same as disclosure of potential expert witnesses as it is not reasonable to require or expect a party to take discovery depositions of all treating and consulting physicians whom the opposing party merely lists as occurrence witnesses in order to avoid the possibility of surprise at trial. The trial court properly limited the testimony of Dr. Sahni to that of an occurrence witness. In reaching this decision, we note that the limitations placed on the testimony of Dr. Sahni did not prevent defendants from presenting his opinion as to the type of stroke plaintiff suffered or the cause thereof. In fact, the opinion of Dr. Sahni was in evidence in plaintiff's case. The only limitation placed on defendants was to limit their ability to explore the basis for this opinion in detail in their case in chief.

■ Defendants next contend that the trial court erred in prohibiting them from referring to what they classified as evidence of plaintiff's earnings after the stroke. Arguing that plaintiff received his full salary of $43,000 for 1980 even though the stroke occurred at midyear, that he received his full salary of $43,000 in 1981, and that he received a salary of $23,010 in 1982, defendants contend that this information should have been presented to the jury since plaintiff claims loss of salary from the date of the stroke.

While plaintiff admits that he did receive those payments, he presented evidence that they were not earned income, but were gratuitous payments from his company. Plaintiff observes that he was a one-quarter owner of that company and that subsequent to his stroke, he

performed no useful services to the company.

Evidence that plaintiff received gratuitous payments from his employer during a period of disability is not admissible in a civil suit for damages (*Geisberger v. Quincy* (1972), 3 Ill. App. 3d 437, 441, 278 N.E.2d 404, 406) and would not reduce defendants' liability (*Cooney v. Hughes* (1941), 310 Ill. App. 371, 378, 34 N.E.2d 566, 570). In view of the overwhelming evidence that plaintiff was incapable of performing useful services subsequent to his stroke, the trial court properly barred testimony concerning gratuitous payments made by plaintiff's employer.

■ Defendants next contend that the trial court erred in prohibiting the cross-examination of Dr. Bernstein concerning the denial of plaintiff's 1982 application for social security disability benefits. Defendants argue that a denial of social security disability benefits has a bearing on the jury's assessment of the extent and degree of plaintiff's disability. Additionally, defendants argue that such a determination has a direct bearing on the credibility of Dr. Bernstein in expressing his opinion as to plaintiff's disability. Although an offer of proof showed that Dr. Bernstein had no knowledge as to the denial of social security disability benefits, defendants argue that prohibiting them from questioning Dr. Bernstein on this issue was a denial of their fundamental right to cross-examination.

The record reveals that in sustaining plaintiff's objection to questioning regarding denial of social security benefits, the trial court was critically aware of the potential impact of such questioning. During an extensive hearing, counsel for all parties expressed opinions as to the potential probative value and prejudicial effect of questions regarding denial of social security disability benefits. In balancing the potential probative value against the prejudicial effect of such questions, the trial court correctly determined that because Dr. Bernstein possessed no knowledge concerning a denial of social security disability benefits, questioning in that area should be prohibited.

■ Defendants next contend that the trial court erred in admitting plaintiff's Exhibit 15, a life-expectancy table. Defendants argue that because plaintiff is a diabetic, his life expectancy would be shorter than normal and the admission of a table for normal, healthy, white males invites improper speculation as to plaintiff's life expectancy. Defendants further contend that both of plaintiff's medical expert witnesses testified that a diabetic is twice as likely as a nondiabetic to experience a stroke. Defendants argue that the error in admitting the life-expectancy table was compounded by the trial court's prohibiting defendants from offering evidence as to plaintiff's mother's medical

history and her death at age 53. Defendants argue that plaintiff's mother also suffered from diabetes mellitus, a hereditary disease, and that her death at age 53 has a bearing on plaintiff's own life expectancy. Finally, defendants argue that they were prohibited from offering evidence as to plaintiff's past alcohol consumption which would have probative value as to plaintiff's life expectancy.

Plaintiff argues that the life-expectancy table was properly admitted into evidence and that the trial court properly prohibited evidence concerning his mother and his prior alcohol consumption. Defendants never offered any evidence about the health of his mother, the severity of her diabetic condition, or the cause of her death except the single brief reference thereto in his medical records. Attempting to correlate his life expectancy to that of his mother would be highly speculative. Dr. Liebhaber testified that with proper medication plaintiff could expect to live a normal life span. Defendants never established or attempted to establish the relevance of prior alcohol consumption and the only evidence they sought to admit was a single statement from his medical records that indicated that during his early years he had been a fairly heavy drinker. Defendants offered no testimony regarding the duration of such consumption, the amounts consumed, the age of plaintiff, plaintiff's current drinking habits or lack thereof, or any indication that plaintiff suffered from alcoholism. We agree that such information had no probative value and could have had a prejudicial impact on the jury.

■ Life-expectancy tables have properly been received in evidence since 1895. (*City of Joliet v. Blower* (1895), 155 Ill. 414, 40 N.E. 619.) It is within the sound discretion of the trial court to allow life-expectancy tables to be admitted into evidence, and it is presumed that the trial court considered the source of the table. (*Sherman v. City of Springfield* (1969), 111 Ill. App. 2d 391, 408, 250 N.E.2d 537, 546.) Defendants had the right to introduce evidence that the life-expectancy table was not a fair assessment of plaintiff's life expectancy, and defendants were invited to introduce such evidence if available; however, the trial court could properly exclude evidence not directly related, especially where the confusion caused by the evidence outweighed its probative value. *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 358, 484 N.E.2d 542, 547; *Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 97, 450 N.E.2d 402, 409.

■ Defendants contend that the trial court committed reversible error in several rulings on plaintiff's Exhibits 1, 2, and 3, the hospital records. Defendants first contend that the trial court erred in allowing

plaintiff to selectively disavow evidence as found in plaintiff's Exhibits 1, 2, and 3. Relying on the rule that one who offers evidence vouches for it, defendants argue that because plaintiff voluntarily offered the medical records in evidence, those records must stand and he cannot impeach them.

Plaintiff contends that he had the right to challenge the truth, accuracy, and correctness of entries made in the hospital records, especially potentially "self-serving" entries made by defendants. Plaintiff points out that the rule that one vouches for his witness is inapplicable, especially to voluminous hospital records.

The rule that a party vouched for his own evidence or witness meant only that he who called a witness was not permitted to impeach that witness by showing lack of credibility. The rule never applied to voluminous documentary evidence. Defendants' position is refuted by the patent unreasonableness of a rule that would prevent a party from contesting the accuracy and credibility of entries and assertions made in records, such as hospital records, that by their nature tend to include extraneous material and entries of a self-serving nature. The last vestiges of that rule were eliminated by Supreme Court Rule 238 (87 Ill. 2d R. 238). A party may now attack the credibility of a witness whom he has called. (*Chew v. Graham* (1984), 122 Ill. App. 3d 461, 464, 461 N.E.2d 574, 577.) Thus, the rule is inapplicable in this case, and plaintiff was not precluded from questioning entries in the hospital records.

■■ Defendants next contend that the trial court committed reversible error in refusing to permit plaintiff's Exhibits 1, 2, and 3 to go to the jury room. Arguing that the case stands or falls based on the contents of these hospital records, defendants argue that the trial court abused its discretion, especially in light of the fact that the jury requested the hospital records. Defendants further argue that since plaintiff's two expert medical witnesses relied upon these records in expressing their opinions as to the alleged malpractice and type of stroke suffered by plaintiff, these records should have been permitted to go to the jury room.

Section 2—1107 of the Code of Civil Procedure provides that papers read or received in evidence "may" be taken from the courtroom by the jury. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1107(d).) Thus, the decision of whether or not to send exhibits to the jury room rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. The Illinois Supreme Court has stated that in dealing with exhibits containing considerable material irrelevant to the issues in the case, "[t]he preferred procedure [is] to

have the relevant portions of the exhibit read to the jury." *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 556, 356 N.E.2d 779, 786.

In the instant case, the trial court properly weighed the possible benefits in allowing the jury to take the exhibits to the jury room against the possible prejudice that might result therefrom. These medical records are lengthy and contain considerable information beyond the understanding of the average juror. The records contain information irrelevant to the case which might have improperly influenced the jury. During the course of the trial, witnesses for each party read extensively from parts of Exhibits 1, 2, and 3. The trial court properly allowed witnesses for each party to refer to and read parts of the records and allowed counsel to refer to those parts of the records in closing arguments. The trial court did not abuse its discretion in refusing to allow Exhibits 1, 2, and 3 to go to the jury room.

■■■ Defendants next contend that it was error for the trial court to give plaintiff's instructions Numbers 11, 13, 17, and 22, for the reason that none of these instructions was supported by the evidence. Defendants have failed to set out these instructions in their brief, to provide a description of the content of the instructions sufficient to permit us to evaluate properly these instructions (*Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 450-51, 241 N.E.2d 187, 191), or to cite any authority in support of their contentions (*Kankakee Concrete Product Corp. v. Mans* (1980), 81 Ill. App. 3d 53, 58, 400 N.E.2d 637, 640). Defendants' argument is nothing more than mere contention, and therefore we will not consider the merits. *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647, 432 N.E.2d 1267, 1272; *Kankakee Concrete Product Corp. v. Mans* (1980), 81 Ill. App. 3d 53, 58, 400 N.E.2d 637, 640.

■■■ Defendants present a laundry list of alleged errors in the remarks and conduct of plaintiff's counsel before the jury. Our review of the record concerning each instance fails to reveal any grounds for reversal. Objections that were overruled were well within the discretion of the trial court, and "where an objection was *** sustained by the trial court, any prejudice resulting from the alleged-improper remarks was rendered harmless." (*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 99, 450 N.E.2d 402, 410-11.) The trial court is in a superior position to observe the impact of alleged misconduct on the jury, and it is within the sound discretion of the trial court to determine whether the remarks and conduct of plaintiff's counsel interfered with defendants' right to a fair trial. (*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 99, 450 N.E.2d 402, 411.) We find no abuse of discretion and will not disturb the rulings of the trial

court.

**■■** Finally, defendants contend that the trial court erred in entering judgment against defendant Pharmacy in the amount of $1,689,641 reduced by 15% for the contributory negligence of the plaintiff and a judgment against defendants Dr. Peart and Clinic in the amount of $1,689,641. Defendants argue that they are joint tortfeasors with the pharmacy and, therefore, a joint and several judgment should have been entered in the amount of $1,689,641. Defendants further argue that to allow the judgment in the form entered by the trial court is to allow plaintiff a double recovery for a single injury. The form of the judgment, defendants argue, is important in that subsequent to entry of judgment defendant Pharmacy settled with plaintiff for $330,101.05 in partial satisfaction of the judgment entered against it. The trial court refused to credit this sum in partial satisfaction of the judgment against defendants Dr. Peart and Clinic. We believe this was error.

Plaintiff contends that the defendants are not joint tortfeasors, but concurrent tortfeasors, and thus the jury correctly decided the issue of each defendant's liability separately. Plaintiff argues he suffered separate and distinct injuries and that recovery from each defendant on the verdicts as returned by the jury does not constitute a double recovery for a single injury; furthermore, because the amount allocated to each defendant for medical care and treatment was approximately half the amount shown by the evidence, the jury intended to apportion the damages between the defendants based on relative fault.

**■■** Generally, joint tortfeasors are jointly and severally liable for plaintiff's injury. (Prosser, Torts sec. 47 (4th ed. 1971).) Because there is mutual liability, contribution and setoff are available to joint tortfeasors. A person injured through another's negligence can recover for both the original injury and any aggravation of that injury caused by a treating physician's malpractice. (*Cram v. Showalter* (1986), 140 Ill. App. 3d 1068, 1072, 489 N.E.2d 892, 895 (as modified on denial of rehearing).) While the original tortfeasor is liable for the total injury suffered by plaintiff (Prosser, Torts sec. 47, at 297 (4th ed. 1971)), the original tortfeasor and the subsequent physician tortfeasor are not joint tortfeasors (*Cram v. Showalter* (1986), 140 Ill. App. 3d 1068, 1072, 489 N.E.2d 892, 895 (as modified on denial of rehearing)). The injuries caused by the original tortfeasor and the subsequent physician tortfeasor are separate and distinct injuries. (140 Ill. App. 3d 1068, 1072, 489 N.E.2d 892, 895 (as modified on denial of rehearing).) The subsequent physician tortfeasor is not liable for the injury done by the original tortfeasor. *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40.

Whether defendants are characterized as joint, concurrent or successive tortfeasors, plaintiff is entitled to be compensated only once for his total damages. (Prosser, Torts sec. 48 at 299 (4th ed. 1971).) Here, plaintiff premised his case on the fact that the defendants were joint tortfeasors. Throughout the trial plaintiff contended that both defendant Pharmacy and defendants Dr. Peart and Clinic were liable for the total damages resulting from plaintiff's ultimate injury, the thrombotic stroke suffered. Plaintiff's jury instructions as to assessment of damages were given to the jury. These instructions told the jury that each defendant was liable for the total extent of plaintiff's damages. In entering the various subcategories of the damage award and the amount of the total damage, the jury utilized identical figures. Finally, the jury was never instructed to apportion the damages between defendants based on any degree of relative fault; in fact, during closing arguments, plaintiff specifically asked the jury to find each defendant liable for the total injury. Under these facts, it would be improper for the jury to apportion damages if, indeed, it would ever be proper in such a case, and we must conclude that the jury did not do so. Any inquiry into what the jury might have intended to do, as a factual inquiry, is foreclosed. Whatever the "intent" of the jury, the policy against double recovery forecloses such an inquiry. See *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, 412 N.E.2d 167.

Based on plaintiff's own theory of the case, the instructions given to the jury, and the identical form of the assessment of damages, we can only conclude that the jury intended to establish one joint and several damage award in the amount of $1,689,641, and it would seem apparent from the magnitude of the verdict against the Pharmacy that the jury attributed to its negligence not only the resulting diabetes out of control but also the permanent damage resulting to plaintiff from the thrombotic stroke. Defendants Dr. Peart and Clinic are entitled to have the judgment rendered against them set off in partial satisfaction for the amount paid by defendant Pharmacy.

Accordingly, the judgment of the circuit court of Jefferson County is affirmed and the cause is remanded for entry of a proper judgment against Dr. Peart and Clinic in accordance with the directions herein expressed.

Affirmed and remanded.

KASSERMAN, P.J., and JONES, J., concur.