LYLE J. REYNOLDS, Plaintiff-Appellee, *v.* ALTON & SOUTHERN RAIL-WAY COMPANY, a Corporation, Defendant-Appellant.

Fifth District    No. 82—330

Opinion filed May 11, 1983.

Donald J. Dahlmann and James C. Cook, both of Walker and Williams, P.C., of Belleville, for appellant.

Edward J. Kionka, of Carbondale, and Jon G. Carlson, of Chapman and Carlson, of Granite City, for appellee.

JUSTICE JONES delivered the opinion of the court:

Plaintiff, Lyle Reynolds, brought this action to recover damages for an alleged violation of the Federal Safety Appliance Act (45 U.S.C. sec. 1 *et seq.* (1970)) which resulted in injury to the plaintiff during the course of his employment as a switchman for the defendant, Alton & Southern Railway Company. The trial court directed a verdict for the plaintiff on the issue of liability and entered judgment on the jury's verdict for damages in the amount of $89,200. The defendant contends on appeal (1) that the trial court erred in directing a verdict under the automatic coupling provision of the Safety Appliance Act (45 U.S.C. sec. 2 (1970)) where the plaintiff's injury occurred while he was aligning a drawbar prior to an attempt at coupling; (2) that the court erred in excluding evidence of a heart attack suffered by the plaintiff during the period in which he was allegedly disabled due to the injury in question; and (3) that the jury's verdict was excessive as a result of trial errors which prejudiced the defendant's right to a fair trial. We affirm.

Plaintiff Reynolds suffered an injury diagnosed as tendinitis or

"tennis elbow" on October 27, 1977, when he attempted to realign a drawbar on one of the railroad cars in the defendant's "bowl" yard. His family doctor, Dr. Walter Zielonko, injected the elbow and saw him five or six times before referring him to Dr. Earl Holt, an orthopedic specialist. Dr. Holt saw the plaintiff on December 1, 1977, on December 15, 1977, and on January 12, 1978. Thereafter the defendant's safety and claims superintendent, G. J. Miller, referred the plaintiff to another specialist, Dr. Elliott O'Reilly, who treated the plaintiff until August 1978. At that time Dr. O'Reilly released the plaintiff to go back to work, and Mr. Miller arranged to have the plaintiff "cleared" by Sutter Clinic before he returned to work on August 13, 1978.

Prior to trial on January 21, 1982, plaintiff's counsel made an oral motion *in limine* requesting the court to exclude any evidence that the plaintiff had suffered a heart attack in December 1977. It was contended that such evidence would be irrelevant to the issue of when the plaintiff was able to go back to work since the plaintiff was disabled due to his elbow injury during the period of time he was recovering from the heart attack. The defendant opposed the motion, alleging that Dr. Holt had released the plaintiff to go back to work on December 1, 1977, three weeks before the plaintiff suffered his heart attack on December 24, 1977. The defendant contended that since the plaintiff was under care for the heart problem until April 15, 1978, the fact of the heart attack was relevant to the issue of when the plaintiff was sufficiently recovered from the elbow injury to resume work.

The court granted the motion *in limine*, stating,

"*** I don't feel the heart attack in question is relevant to the issues in the case[. I]f he had a disability from his elbow and was unable to be back to work, which is the subject matter of the lawsuit, he would not have been able to go back to work regardless of the heart attack, and that's the issue of disability resulting from the injury, and on the other hand, if his elbow had healed and got better, it would seem to me that that is the issue involved in the case. The—I think to some extent this is similar to an accident or injury to an unrelated portion of the body involved in a tort, and I don't think that this is relevant ***."

The cause proceeded to trial, and plaintiff Reynolds, testifying in his own behalf, stated that at the time of his injury he was working in the defendant's "bowl" or "hump" yard where railroad cars are transferred from one track to another and classified in order to make up trains. The cars are pushed by an engine onto a small hill or hump and then are released without brakes to travel down into the bowl yard where they are to couple together on impact. When the track is full it

is "locked out" so that no more cars will be put on the track, and a switchman checks the track to make sure the cars have coupled. In order for the cars to couple, the couplers must be open and the drawbars to which the couplers are attached must be in line with each other. When cars fails to couple because of a misaligned drawbar, it is the switchman's responsibility to realign the drawbar so that coupling may be completed.

On the night of the plaintiff's injury, he was checking a track of about 20 cars which had already come down the hump. When he was approximately 10 to 12 cars from the engine, he noticed that the coupling between two cars had not been made because of a drawbar that was out of line. He had the engine pull the two cars apart and then stepped between them in order to pull and lift the drawbar toward the center to straighten it. With this action he injured his left elbow.

The plaintiff testified that he had his arm X-rayed that evening and then consulted his family doctor the next day. His arm was stiff, swollen and sore, and after five or six visits with Dr. Zielonko, he was referred to Dr. Holt on December 1, 1977. Dr. Holt examined his elbow and told him he thought surgery was necessary. The plaintiff stated that after he told Dr. Holt he did not want surgery, Dr. Holt became "cool" toward him and gave up interest in him. Because his arm was still bothering him, he talked to Mr. Miller, the defendant's safety and claims agent, and Miller set up an appointment for him with Dr. O'Reilly, who recommended ultrasound treatments. The plaintiff testified that his arm continued to be sore through the winter, spring, and summer of 1978. It would get stiff and would "flare up" when he engaged in various activities. He had no strength in the arm and felt he was unable to go back to work as a switchman at that time.

After he returned to work in August 1978, the plaintiff continued to have difficulties with his arm. It would get stiff and sore, and he would have to stay home from work until the soreness went away. In the fall of 1979 he consulted Dr. Max Goldenberg, who had been recommended by his attorneys. In the year prior to trial in January 1982, the plaintiff had not missed any work because of his arm.

On cross-examination the plaintiff stated that during his first appointment with Dr. Holt on December 1, 1977, Dr. Holt injected his elbow and advised him to rest it. Dr. Holt told the plaintiff at his last appointment on January 12, 1978, that he was able to go back to work. The plaintiff went to see Mr. Miller sometime after he saw Dr. Holt because he was still having some soreness in his arm and wanted to see another doctor. The plaintiff denied that Dr. O'Reilly told him shortly after his first visit that he was able to go back to work.

G. J. Miller, the defendant's safety and claims superintendent, was called as an adverse witness for the plaintiff. He testified that he had arranged for the plaintiff to see Dr. O'Reilly in the spring of 1978. The plaintiff was still complaining of problems with his arm at that time and wanted another doctor to examine him. Dr. O'Reilly reported to Miller that surgery on the plaintiff's elbow might be a possibility but that he (Dr. O'Reilly) did not feel it was necessary. After the plaintiff's condition improved, Miller arranged for him to be examined by Sutter Clinic because of the defendant's medical rules that any time an employee is absent from work and is examined by another doctor, the employee must be re-examined by Sutter Clinic before returning to work.

Dr. Goldenberg testified finally that he first saw the plaintiff on October 15, 1979. In relating the history the plaintiff had given him, Dr. Goldenberg stated:

"Christmas Eve of 1977 he had a heart attack, was in the hospital about two weeks. In January of 1978 he was released as far as his heart was concerned, but he was not released as far as his elbow was concerned."

In his examination of the plaintiff, Dr. Goldenberg found that the plaintiff's left forearm was measurably smaller than his right forearm, indicating atrophy of the muscles of that arm due to lack of use or exercise.

Dr. Goldenberg treated the plaintiff with medication and ultrasound therapy, which provided temporary relief. Dr. Goldenberg stated, however, that injuries of the type the plaintiff had could "come and go, being worse at times and then completely calmed down for awhile." He was of the opinion that the plaintiff's condition constituted a permanent disability in that he could have recurrences for the rest of his life. He further testified that assuming the plaintiff was no longer employed by the defendant in the future, he would be declared "unemployable for certain classes of employment" such as those requiring heavy lifting or even light overhand or "dead-hand" lifting.

On cross-examination Dr. Goldenberg stated that the plaintiff has full function of his arm as far as extending and flexing are concerned, that he can lift overhead, and that the sensation in his arm is normal. He could continue to work as a switchman assuming that if he were required to do something on a given day when he was in pain, he would not do it.

Following Dr. Goldenberg's testimony, the defendant renewed its offer of proof concerning the fact of the plaintiff's heart attack on December 24, 1977, and his continued disability from the heart attack un-

til April 15, 1978. The defendant argued that Dr. Goldenberg's reference to the heart attack had "opened the door" to testimony by Dr. Holt that the plaintiff was able to go back to work despite the elbow injury before suffering his heart attack. The court again denied the offer of proof and ruled that Dr. Holt's testimony regarding the heart attack would be inadmissible.

An evidence deposition of Dr. Holt's testimony was read to the jury as part of the defendant's case. According to Dr. Holt, he first saw the plaintiff on December 1, 1977, at which time he diagnosed his injury as "tennis elbow or radiohumeral bursitis on the left." He injected the plaintiff's elbow with a small amount of local anesthetic and hydrocortisone, which, he stated, "reduces local inflammation and sometimes effects a rather prompt cure in mild cases." Dr. Holt was then asked:

"Q. Following the treatment on that occasion, did you make some medical recommendations to the patient with respect to his work activity with reference to his left arm?

[DR. HOLT]: Yes.

Q. And what were the recommendations you made on December 1, 1977, to Mr. Reynolds?

A. I thought he could get on back to work. I was there on Thursday. I am always there on Thursdays. I don't have any exact record of how or when. But generally, when I do a tennis elbow on a Thursday, I think that it may sting a little bit Friday. But they are ready to go back to work Monday. So that would be what I think he might have done."

Dr. Holt saw the plaintiff again on December 15, 1977, at which time he found the plaintiff "still had some tenderness at the lateral epicondyle," although he could straighten his arm out better. Both Dr. Holt and the plaintiff thought his condition had improved since the first visit. On the plaintiff's third and final visit on January 12, 1978, the elbow "seemed all right," and Dr. Holt discharged the plaintiff. Dr. Holt's diagnosis as of January 1978 was that the plaintiff had "gotten over the radiohumeral bursitis of his left elbow." He was of the opinion that the plaintiff could perform the usual and customary duties of a railroad switchman and did not feel that the plaintiff's elbow condition was permanently disabling or even totally disabling on a temporary basis.

Following Dr. Holt's testimony the plaintiff moved for a directed verdict on the issue of the defendant's liability under the Safety Appliance Act. The court granted the motion for directed verdict, and after closing arguments, the cause went to the jury for determination of the plaintiff's damages. The jury returned a verdict for the plaintiff, as-

sessing damages in the amount of $89,200. Judgment was entered on the verdict, and the defendant has appealed from that judgment.

■■ The defendant contends initially that the trial court erred in directing a verdict for the plaintiff on the basis of the defendant's violation of section 2 of the Safety Appliance Act (45 U.S.C. sec. 2 (1970)). That section provides:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The defendant argues that the coupling process had not yet begun when the plaintiff was injured, as the purpose of "humping" the cars onto the tracks in the bowl yard was to classify them on a certain track before "coupling" was actually effected by the switchmen. Thus, the defendant maintains, where the plaintiff was merely aligning a drawbar in anticipation of eventual coupling, there was insufficient evidence of a failed coupling to support the court's directed verdict for violation of the Act.

A review of the record in the instant case as well as a consideration of pertinent case law leads us to conclude, however, that this argument is without merit. Testimony concerning the humping process indicated that coupling of the cars was an integral part of the humping process. The plaintiff testified that the cars were to couple automatically on impact as they came down the hump, and the switchman's job was merely supplemental in that he would check the track to "couple up" or "couple back" any cars that had failed to couple properly. In order to accomplish this task, it was necessary for the switchman to straighten any misaligned drawbars that had prevented automatic coupling. Thus, the evidence established that the plaintiff was engaged in the coupling process when he suffered the injury in question. The plaintiff's testimony regarding the humping and coupling process was uncontradicted by the defendant and, indeed, was corroborated by one of its witnesses. We therefore find no basis in the record for the defendant's contention that its alleged violation of the Act constituted a jury question. See also *Smiley v. St. Louis-San Francisco Ry. Co.* (1949), 359 Mo. 474, 222 S.W.2d 481 (section 2 does not require that a car be moved with an intention or purpose to couple it by impact if it is nonetheless kicked onto the track with sufficient impact to make an automatic coupling).

The case law pertaining to the question of liability under the Act for a misaligned drawbar is to the same effect. In this court's recent

decision, *Buskirk v. Burlington Northern, Inc.* (1982), 103 Ill. App. 3d 414, 431 N.E.2d 410, we held under similar facts that the failure of cars to couple automatically upon impact because of a misaligned drawbar constituted a violation of section 2 of the Act. In that case the cars in question were "kicked" (pushed by an engine) rather than "humped" onto tracks in the defendant's classification yard for eventual connection with outgoing trains. The plaintiff Buskirk, a railroad switchman, noticed that two cars had failed to couple after being kicked onto the switch track because their drawbars had skewed in opposite directions. He went between the cars to straighten the drawbars and injured his back in the process. This court, noting that the Act imposes absolute liability for operating a car on which the drawbar is so far out of line as to prevent automatic coupling (see *Kansas City Southern Ry. Co. v. Cagle* (10th Cir. 1955), 229 F.2d 12, *cert. denied* (1956), 351 U.S. 908, 100 L. Ed. 1443, 76 S. Ct. 697), held the defendant railroad liable as a matter of law. "It [was] sufficient [the court stated] for the plaintiff to have shown that, after a failure of the cars to couple automatically, he went between them and was injured while trying to straighten the misaligned bar." 103 Ill. App. 3d 414, 415, 431 N.E.2d 410, 412.

In the instant case where the plaintiff has made a similar showing, we find the *Buskirk* decision controlling on the issue of the defendant's liability under the Act. (*Cf. Schaaf v. Chesapeake & Ohio Ry. Co.* (1982), 114 Mich. App. 171, 317 N.W.2d 679 (trial judge erred in instructing the jury that railroad car drawbars had to be aligned before a violation of the Safety Appliance Act could occur through failure of the cars to couple automatically on impact).) The evidence in the instant case was sufficient as a matter of law to constitute cause in fact, and there was no question of fact in the issue of proximate cause to be resolved by the jury.

While, as the defendant points out, there are circumstances in the railroad industry where workers may be between cars without giving rise to liability under the Act, the instant situation does not come within that exception. In *Smiley v. St. Louis-San Francisco Ry. Co.*, the court distinguished cases in which employees had gone between cars, not to effect a coupling, but to repair a coupler needing repairs. Since the employees were not thus engaged in a coupling process when they were injured, the Act, which provides against the risk of coupling cars rather than repairing them, was not invoked.

In the instant case the track was "locked out" so as to prevent further coupling by impact when the plaintiff went between the cars. The plaintiff's objective, however, was to couple, and he was thus "en-

gaged in a coupling effort" (see *Smiley v. St. Louis-San Francisco Ry. Co.* (1949), 359 Mo. 474, 481, 222 S.W.2d 481, 484-85) at the time of his injury. Section 2 of the Act was specifically designed to protect parties who are injured while going between cars to effect a coupling that did not take place automatically. (*Buskirk v. Burlington Northern, Inc.*; *Southern Pacific Co. v. Mahl* (5th Cir. 1969), 406 F.2d 1201.) This section encompasses the plaintiff's actions in the instant case, and we find no error in the trial court's directed verdict for the plaintiff on the issue of liability.

■ The defendant next contends that the trial court erred in excluding evidence of the heart attack suffered by the plaintiff on December 24, 1977. The defendant asserts that since Dr. Holt had released the plaintiff to return to work on December 1, 1977, evidence that the plaintiff suffered a heart attack over three weeks later should have been admitted to show why the plaintiff did not return to work at that time.

In support of its argument, the defendant cites the general rule that evidence as to the general health or physical condition of an injured person both before and after the injury is admissible to show the extent, nature and probable effect of the injury and the cause of the subsequent physical condition. (15 Ill. L. & Prac. *Damages* sec. 234 (1968); see *Parnham v. Carl W. Linder Co.* (1962), 36 Ill. App. 2d 224, 183 N.E.2d 744.) As the plaintiff points out, however, this rule is limited by the requirement that such evidence be sufficiently connected with the injury in question or be material to the issue of damages. (15 Ill. L. & Prac. *Damages* sec. 234 (1968); see *Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770.) The defendant in the instant cause makes no claim that the plaintiff's subsequent heart attack was related to the elbow injury for which he sought recovery. It contends, rather, that evidence of the heart attack was relevant to the issue of when the plaintiff was sufficiently recovered from the injury to resume work.

While we are aware of no case involving this precise issue, in similar cases where the question was whether the plaintiff was unable to work because of an alleged injury, courts have held that the defendant may present evidence to disprove that proposition but may not go further and inject into the case an issue collateral to the alleged injury. (*Cf. Jordan v. Morrissey* (1970), 130 Ill. App. 2d 418, 264 N.E.2d 734 (defendant could introduce evidence that plaintiff did not leave his job for health reasons but would not be allowed to introduce evidence that plaintiff had been fired for dishonesty); *Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 179 N.E.2d 838 (defendant could re-

but claim that plaintiff was forced to retire because of an alleged injury but could not offer evidence that plaintiff's real motive related to marital difficulty).) It is within the trial court's discretion to exclude evidence not directly related to the matter at hand where the confusion of issues resulting from its admission would not be compensated for by its usefulness in the trial. See *Veer v. Hagemann* (1929), 334 Ill. 23, 165 N.E. 175; Hunter, Trial Handbook for Illinois Lawyers sec. 33:11 (4th ed. 1972); 34 Ill. L. & Prac. *Trial* sec. 47 (1958).

■ In the instant case evidence of the plaintiff's heart attack, offered to rebut the plaintiff's claim that he was disabled for almost a year from the injury to his elbow, was collateral in that it was not otherwise connected to the injury for which recovery was sought. (See E. Cleary and M. Graham, Handbook of Illinois Evidence sec. 607.2, at 263 (3d ed. 1979) (a matter is collateral if not relevant for some purpose other than to contradict the in-court testimony of a witness).) The matter at issue in the litigation was how long the plaintiff was disabled because of his elbow injury. The defendant was properly allowed to present testimony by Dr. Holt that he thought the plaintiff could "get on back to work" on December 1, 1977, and that he discharged the plaintiff on January 12, 1978, when he felt the plaintiff had recovered from his injury. It was for the jury to evaluate this testimony along with the plaintiff's testimony that he continued to be disabled by the injury and sought further medical treatment by Dr. O'Reilly, who released him in August 1978. Evidence of the heart attack suffered by the plaintiff in the meantime did not relate to the issue of the plaintiff's disability from his injury, as there was no indication that it delayed or affected the plaintiff's recovery from the elbow injury. Thus, the trial court properly excluded this evidence to prevent speculation and confusion on the part of the jury as to the nature and extent of the plaintiff's disability.

The cases relied upon by the defendant in this regard are distinguishable from the case at bar. In *Parnham v. Carl W. Linder Co.* the court allowed the plaintiff, who was seeking damages for an eye injury, to introduce evidence that his other eye was not in perfect condition, since it "tend[ed] to show, the probable effect of the injury received, upon the plaintiff." (36 Ill. App. 2d 224, 236, 183 N.E.2d 744, 750.) In the instant case, the plaintiff's subsequent heart attack was unrelated to the injury in question and could not be said to show the effect of the injury on the plaintiff. Two other cases cited by the defendant, *McKasson v. Zimmer Manufacturing Co.* (1973), 12 Ill. App. 3d 429, 299 N.E.2d 38, and *Noncek v. Ram Tool Corp.* (1970), 129 Ill. App. 2d 320, 264 N.E.2d 440, likewise involve the special effect of injuries upon

plaintiffs who suffered from disabilities prior to the injuries in question. The defendant's reliance upon *Olson v. Hayes* (1978), 37 Or. App. 583, 588 P.2d 68, is also misplaced because that case involved the apportionment of damages for injuries sustained in successive automobile collisions where the injuries were similar and affected the same part of the body. The plaintiff here sought to recover only for his elbow injury, and since it was unrelated to his cardiac problem, there was no question of apportionment of damages. In light of these distinctions, we find no error in the trial court's exercise of discretion in excluding evidence of the plaintiff's heart attack.

■■ ■ The defendant contends finally that its right to a fair trial was prejudiced by the cumulative effect of erroneous rulings by the trial court and improper statements by the plaintiff's counsel before the jury. The first of these alleged errors was the court's admission of the plaintiff's testimony with regard to his conversations with Dr. O'Reilly concerning the possible need for surgery on his elbow. While the defendant contends that this constituted inadmissible hearsay testimony, we believe the testimony was properly admitted for the nonhearsay purpose of showing why the plaintiff had not returned to work prior to August 1978. When an out-of-court statement is used not as evidence of the fact asserted but as circumstantial evidence for another purpose, the hearsay rule does not apply. (*Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 305 N.E.2d 648.) At most, the defendant would have been entitled to a limiting instruction as to this testimony but did not request one and has therefore waived any objection it may have had. See *Eizerman v. Behn* (1956), 9 Ill. App. 2d 263, 132 N.E.2d 788.

■ The defendant additionally asserts that the court erred in admitting testimony concerning coupling operations on its property which had no relationship to the instant occurrence. Whether or not this testimony was inadmissible on grounds of irrelevancy, the record is such that the defendant could not have been prejudiced by its admission. Where, as here, the trial court has directed a verdict and its action in doing so is justified by competent evidence in the case, any error in this regard is harmless and does not require reversal. See 3 Ill. L. & Prac. *Appeal & Error* sec. 818, at 41 (1953).

■ The defendant further contends that the court erred in permitting the plaintiff to examine G. J. Miller, the defendant's superintendent of safety and claims, as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60) after Miller was called to testify as a witness for the plaintiff. The defendant has cited no authority for its argument, and we have found none addressing this issue. The defendant does not claim, however, that Miller was

unqualified for section 60 examination by the plaintiff, and the record fails to show that the defendant was prejudiced in any way by the plaintiff's delayed announcement that Miller had been called as a section 60 witness. Moreover, the defendant made no objection at trial as to the leading nature of the questions propounded prior to the section 60 announcement. Under these circumstances the trial court properly allowed Miller to be examined as an adverse witness under section 60, and its ruling did not constitute error.

■■ Finally, upon a review of the record we cannot say that the defendant was so prejudiced by remarks and conduct of plaintiff's counsel before the jury as to warrant reversal. The defendant failed to object at trial to many of the statements now complained of and thus has waived its right to object upon appeal. (*Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679.) In other instances where an objection was promptly made and sustained by the trial court, any prejudice resulting from the allegedly improper remarks was rendered harmless. (*Nakis v. Amabile* (1981), 103 Ill. App. 3d 840, 431 N.E.2d 1255.) Because of the trial court's superior opportunity to observe the impact of plaintiff's counsel's comments on the jury, it was within the court's sound discretion to determine whether such arguments were inflammatory or whether the allegedly prejudicial statements interfered with the defendant's right to a fair trial. (*Walters v. Taylor* (1976), 36 Ill. App. 3d 934, 344 N.E.2d 765.) We find no abuse of discretion here and accordingly will not disturb the court's ruling in this regard.

For the reasons set forth in this opinion, we hereby affirm the judgment of the circuit court of Madison County.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.