CLARENCE LEVECK, JR., Plaintiff-Appellee, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.

First District (5th Division)   No. 85—1235

Opinion filed May 9, 1986.—Supplemental opinion on denial of rehearing October 24, 1986.

Lord, Bissell & Brook, of Chicago (Alvin E. Domash, Paul G. Velbergs, and Hugh C. Griffin, of counsel), for appellant.

Robert E. Harrington, Jr., of Harrington & Harrington, Ltd., of Chicago (Henslee, Monek & Henslee, of counsel), for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant appeals from a directed verdict for plaintiff in an action brought under section 2 of the Federal Safety Appliance Act (45 U.S.C.A. sec. 2 (1970)), to recover for injuries sustained during the course of his employment, contending that the trial court erred in (a) excluding certain evidence which contradicted plaintiff's version of the occurrence and rebutted his claim that his injuries proximately resulted from violations of the Act, and (b) directing a verdict for plaintiff on the issue of liability.

The record discloses that on the night of the occurrence plaintiff

was working as a switchman at defendant's South Yard in Lansing, Michigan. It was the responsibility of plaintiff and the other members of the night crew to separate a train of 40 or 50 cars they had transported from another yard, switch the cars from the main track and then connect them to various outgoing trains located on tracks 1 through 8.

Plaintiff testified that he was in the vicinity of tracks 3 and 4 at about 12:30 a.m. when the conductor, Mark Wise, instructed him to couple the cars on track 2. He gave a signal to the brakeman on the engine—which was located on the southern end of track 2 facing north—to "tie in," *i.e.*, push the cars together, but as he walked toward the train he noticed that two cars, located approximately five to six car lengths (350 to 360 feet) north of the engine, had not coupled. In order to effect a coupling, it is necessary that the drawbars on both cars be centered and that at least one knuckle be open. Under normal circumstances, when the cars are pushed together the knuckles close and a pin drops, locking the coupling mechanism. Inspecting the two cars which had not coupled, he observed that they were about 4 to 5 feet apart, that both drawbars were centered and that both knuckles were open. Stepping off the track, which curved eastward, he signalled the engineer, who was seated on the right (east) side of the engine to push ahead so as to join the cars. Upon impact, he heard the clash of the metal making contact, which was normal, but saw that the cars had still failed to couple. He signalled the engineer to pull the southern car—the B & O boxcar—back about 30 feet, the minimum distance prescribed by the safety rules, and then stepped onto the track between the cars to determine the cause of the failed coupling. At that point, he saw that the drawbar on the north—or "B"—end of the B & O boxcar had skewed about one foot to the east and that the knuckle was still open. The drawbar on the north car was centered but the knuckle thereon was closed. He walked back to the B & O car and, placing his left foot inside the rail and his right foot outside, he took hold of the drawbar and attempted, by exerting force with his shoulder, to realign it. As he did so, his right knee "popped," and he felt a very sharp pain. He then fell to the ground, striking his knee on the top of the rail. A few seconds later Wise arrived, and after helping him off the track, Wise also attempted to adjust the drawbar but was unable to move it. Wise then assisted him to the yardmaster's tower where he (plaintiff) completed an accident report after which he was transported to the hospital by the trainmaster.

After a lengthy examination regarding the nature and extent of

his injuries and the treatment he received therefor, plaintiff stated, on cross-examination, that although the engine traveled only a few feet at about two miles per hour, based on his experience, the jolting of the cars when the slack between them ran out was sufficient, due to the amount of weight being pushed forward, to have caused the drawbar to move off center; and that the knuckle on the north car may have closed when it was struck by the drawbar that had become misaligned.

Mark Wise testified that he was near tracks 7 and 8 when he noticed that plaintiff was having difficulty making a coupling on track 2. Plaintiff had signalled the engine forward, but when the cars did not join, he stepped eastward so as to direct the engineer to back up and then went between them. As he (Wise) walked across the tracks to assist, he saw that the drawbar on the B-end of the southern car was off center to the east and that plaintiff was attempting to push it back on center when he fell between the rails. After assisting plaintiff off the track, he attempted to adjust the drawbar so as to complete the coupling procedure on that track, but it would not move. He then helped plaintiff walk to the yardmaster's tower, after which he returned to work. Although the B & O remained on track 2 that night, he saw that it had been pushed further down the track by the time he left the yard at about 5 a.m.

In support of its theory that the injury did not happen as plaintiff claimed, defendant sought to introduce the testimony of three of its employees who inspected the B & O car at about 10 o'clock in the morning after the accident and found the drawbar in question to be in good working order. Specifically, Trainmaster John Schall testified that he went home after taking plaintiff to the hospital for treatment and did not return to the yard until about 3 a.m. He reported back to work several hours later and, together with the yardmaster and the equipment foreman, performed an inspection of the B & O boxcar and the area around it. He tested the drawbars on both ends of the car and found that they both moved freely from side to side. He also observed that there were no fresh scratch marks on the rusted surface of the metal as would likely be present if the knuckle had slid over the bar or the drawbars had crossed during an attempted coupling. The B & O car was still on track 2 at the time of the inspection and, to his knowledge, had not been repaired or modified since the accident. On cross-examination, Schall acknowledged that the inspection took place approximately 9½ hours after plaintiff was injured; that he did not know whether the car had been moved during that time because he was not at the yard; that although at the

time of the inspection it was situated about three to four car lengths north of the office at the southern end of track 2, he could not recall which way it was facing; and that while he considered the absence of scratch marks significant, he had not noted that finding in his report.

In an evidence deposition, John Workman, the equipment foreman, testified that when he inspected the drawbars on both ends of the B & O car involved they worked normally and could be moved from side to side with one hand. On cross-examination, Workman stated that it was his understanding that plaintiff was injured adjusting the drawbar on the A-end of the car, which at the time of the inspection was facing north on track 2; that although some cars are equipped with self-centering drawbars which automatically realign when uncoupled, the ones on the B & O car in question were not of that type; and that when he first saw it, the drawbar was off center.

Yardmaster Stanley Michel testified that at the time of the inspection, the B-end of the car was facing south on track 2 and that the drawbar thereon moved from left to right with no difficulty.

Plaintiff then renewed his motion, made prior to trial, to exclude all evidence relating to the inspection, arguing that it was (a) incompetent because defendant had failed to establish that the condition of the car and the coupling mechanism thereon was the same as at the time of the accident, maintaining that, in fact, the testimony of Workman and Michel established that the car had been turned in the opposite direction on the track, and (b) immaterial because under the Safety Appliance Act, a railroad is absolutely liable for injuries resulting from the failure of a coupler to couple automatically regardless of whether it functioned properly before or after the accident.

After argument by counsel, the trial court granted plaintiff's motion to exclude the post-accident inspection evidence, specifically ruling that such evidence is not material in an action alleging a violation of the Safety Appliance Act but also noting that defendant had not conclusively established in its offer of proof that the location and condition of the car had not been changed in the 9½ hours between the accident and the inspection.

John Schall then testified that assuming that the two cars involved were 4 to 5 feet apart on a straight track with their drawbars centered and knuckles open and that the engine reached a speed of no more than two miles per hour before being signalled to stop, it was his opinion, based on his experience in having inspected thousands of railroad cars, that the drawbars would not "bypass" or become misaligned as plaintiff had described even if they failed to couple but, instead, would either bounce back apart or remain to-

gether, but unlocked. Schall also stated, however, that the force of the weight of the engine together with that of the four or five cars in front of it could knock a drawbar out of alignment depending on the rate of acceleration and braking, and he acknowledged that drawbars are supposed to couple automatically.

Following Schall's testimony, the trial court granted plaintiff's motion for a directed verdict on the issue of liability, submitted the question of damages to the jury, and subsequently entered judgment of $1.1 million for plaintiff on the jury's verdict. Defendant's motion for a new trial was denied, and this appeal followed.

OPINION

■ Defendant first contends that the trial court erred in excluding all evidence it sought to introduce relating to the post-accident inspection of the railroad car at issue. We disagree

Initially, we note that section 2 of the Safety Appliance Act, upon which this action is predicated, provides:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." 45 U.S.C.A. sec. 2 (1970).

This section was enacted to obviate the risks to employees by reason of their going between railroad cars to manually couple and uncouple them. (*United Transportation Union v. Lewis* (D.C. Cir. 1983), 711 F.2d 233; *McGee v. Burlington Northern, Inc.* (1977), 174 Mont. 466, 571 P.2d 784.) Courts interpreting section 2 have uniformly held that the failure of cars to couple automatically because of a misaligned drawbar constitutes a violation of the Safety Appliance Act and renders the carrier absolutely liable for injuries resulting therefrom (*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 450 N.E.2d 402; *Buskirk v. Burlington Northern, Inc.* (1982), 103 Ill. App. 3d 414, 431 N.E.2d 410; *Coleman v. Burlington Northern, Inc.* (8th Cir. 1982), 681 F.2d 542; *Kansas City Southern Ry. Co. v. Cagle* (10th Cir. 1955) 229 F.2d 12, *cert. denied* (1956), 351 U.S. 908, 100 L. Ed. 1443, 76 S. Ct. 697), without regard to negligence and irrespective of whether the coupler functioned properly before and/or after the malfunction, the duty being an absolute one requiring proper performance on the occasion in question (*Affolder v. New York, Chicago & St. Louis R.R. Co.* (1949), 339 U.S. 96, 94 L. Ed. 683, 70 S. Ct. 509; *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.*

(1949), 338 U.S. 384, 94 L. Ed. 187, 70 S. Ct. 200; *Carter v. Atlanta & St. Andrews Bay Ry. Co.* (1949), 338 U.S. 430, 94 L. Ed. 236, 70 S. Ct. 226; *Coleman v. Burlington Northern, Inc.* (8th Cir. 1982), 681 F.2d 542; see also *Atlantic Coast Line R.R. Co. v. Dunivant* (1956), 265 Ala. 420, 91 So. 2d 670; *Atlantic Coast Line R.R. Co. v. Brown* (1956), 93 Ga. 805, 92 S.E.2d 874). Thus, to recover under section 2, a plaintiff need only establish that his injuries were caused, in whole or in part, by a violation thereof (*Crane v. Cedar Rapids & Iowa City Ry. Co.* (1969), 395 U.S. 164, 23 L. Ed. 2d 176, 89 S. Ct. 1706; *Metcalfe v. Atchison, Topeka & Santa Fe Ry. Co.* (10th Cir. 1974), 491 F.2d 892; *McCalley v. Seaboard Coast Line R.R. Co.* (1972), 265 So. 2d 11; see also *Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 450 N.E.2d 402; *Buskirk v. Burlington Northern, Inc.* (1982), 103 Ill. App. 3d 414, 431 N.E.2d 410; *Bardo v. Chicago River & Indiana R.R. Co.* (1967), 87 Ill. App. 2d 445, 231 N.E.2d 713).

It is plaintiff's position that these authorities hold that where, as here, an action is based solely on an alleged violation of section 2 and the complaint contains no allegations of negligence, post-accident inspection evidence showing that the coupler functioned properly on a later occasion is immaterial and, therefore, inadmissible. Defendant disagrees, asserting that these cases stand for the limited proposition, based upon the factual situations involved, that post-occurrence inspection evidence is immaterial where it is uncontested that plaintiff's injuries resulted from a violation of the Safety Appliance Act, and that they do not preclude the introduction of such evidence to attack the plaintiff's credibility and to rebut allegations (1) that a violation occurred, *i.e.*, that the cars failed to couple, and/or (2) that his injuries were proximately caused thereby, where, as in this case, those assertions were contested.

Relying primarily on *Lewis v. Baker* (2nd Cir. 1975), 526 F.2d 470, *Texas & Pacific Ry. Co. v. Griffith* (5th Cir. 1959), 265 F.2d 489, and *Texas & New Orleans R.R. Co. v. Underhill* (5th Cir. 1956), 234 F.2d 620, defendant maintains that the testimony of Schall, Workman and Michel, that the drawbar moved freely and operated properly when they tested it at 10 a.m., and Schall's additional testimony as to the absence of fresh scratch marks on the rusted surface, which, he opined, would likely be present had the drawbar been misaligned when it made contact with the other car, was admissible to challenge plaintiff's credibility and to refute his allegations that the drawbar malfunctioned, that the cars failed to couple and, hence, that his injuries were proximately caused by a violation of section 2 of the

Safety Appliance Act.

Initially, we note that while it is true that post-accident inspection evidence was allowed in both *Lewis* and *Griffith*, neither action was predicated on section 2 of the Safety Appliance Act relating to automatic couplers as is the case at bar. Rather, recovery was sought under section 51 of the Federal Employers' Liability Act (FELA) (45 U.S.C.A. sec. 51 (1970)), dealing with the liability of common carriers for negligence resulting in injuries to their employees, and under section 11 of the Safety Appliance Act (45 U.S.C.A. sec. 11 (1970)), which imposes liability upon railroads for failure to equip their cars with "efficient hand brakes." Because a finding as to inefficiency requires a showing either that the brake was defective *or* that it failed to function properly when operated by the brakeman in the normal and customary manner (*Selby v. Chesapeake & Ohio Ry. Co.* (1956), 11 Ill. App. 2d 395, 137 N.E.2d 657; *Woods v. New York, Chicago & St. Louis R.R. Co.* (1949), 339 Ill. App. 132, 88 N.E.2d 740, *cert. denied* (1950), 340 U.S. 831, 95 L. Ed. 610, 71 S. Ct. 48), post-accident inspection evidence offered to show the absence of defects or that the malfunction occurred as a result of improper operation of the brake by the brakeman is both relevant and admissible in actions brought under section 51 of FELA. As recognized in both *Lewis* and *Griffith*, however, where there is a failure of the brake owing to some unexplained malfunction, under the Supreme Court holdings in *Affolder v. New York, Chicago & St. Louis R.R. Co.* (1949), 339 U.S. 96, 94 L. Ed. 683, 70 S. Ct. 509, *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.* (1949), 338 U.S. 384, 94 L. Ed. 187, 70 S. Ct. 200, and *Carter v. Atlantic & St. Andrews Bay Ry. Co.* (1949), 38 U.S. 430, 94 L. Ed. 236, 70 S. Ct. 226, evidence that it functioned properly before and after the accident is immaterial. (*Lewis v. Baker* (2nd Cir. 1975), 526 F.2d 470, 475; *Texas & Pacific Ry. Co. v. Griffith* (5th Cir. 1959), 265 F.2d 489, 492-93.) Thus, while *Lewis* and *Griffith* do not contradict defendant's argument here, neither do they resolve, or even consider the issue raised thereby.

The only one of the three cases cited by defendant involving an alleged violation of section 2 was *Texas & New Orleans R.R. Co. v. Underhill* (5th Cir. 1956), 234 F.2d 620. There, plaintiff alleged that he was injured when the boxcar on which he was riding uncoupled from another car and struck the engine, causing him to be thrown from it. In support of its defense theory that the sole proximate cause of plaintiff's injuries was his failure to make a proper coupling in the first instance, the railroad introduced evidence that when inspected after the accident the couplers in question functioned prop-

erly. Although the evidence was admitted at trial[1] the court thereafter instructed the jury that since the action was not brought on the theory of negligence, the condition of the couplers before and after the accident was immaterial, the only questions being whether or not the cars had uncoupled and, if so, whether such uncoupling was the direct and proximate cause of plaintiff's injuries. The railroad appealed, arguing that the instruction improperly removed the inspection evidence from the jury's consideration. The *Underhill* court agreed, stating:

> "As the real question for the jury's determination was whether a coupling was in fact made, it could not be the law that the evidence offered by the defendant to the effect that the couplers were not defective immediately after the event was immaterial. It was quite material in enabling the jury to decide whether the plaintiff's testimony that he had made a good coupling was credible. It was, of course, immaterial as bearing on the question of negligence, which is undoubtedly the thought the trial court sought to express. On the question whether a good coupling had in fact been made, it was quite material. The jury was called on to determine whether the plaintiff had placed the parts in proper alignment for effecting a coupling. He testified that he had done so. From the proof that, when properly aligned, they functioned properly immediately after the accident, the jury could infer that he had not done so." (234 F.2d 620, 623.)

Defendant argues, in essence, that here, as in *Underhill*, the post-occurrence inspection evidence was improperly withheld from the jurors, positing that they could have inferred, from the testimony of its employees who tested the drawbar after the accident and found both its appearance and performance to be normal, that the cars did not fail to couple and/or that the drawbar did not stick, as he claimed, and that, therefore, his injuries could not have been caused by a violation of the Safety Appliance Act.

Plaintiff urges us to disregard *Underhill*, asserting that it constitutes a misreading of the Safety Appliance Act and the cases interpreting it and was, in fact, declared to be "not controlling" in its own circuit by the Court of Appeals in *Texas & Pacific Ry. Co. v. Griffith* (5th Cir. 1959), 265 F.2d 489—one of the two other cases relied upon by defendant as support for the same proposition. He ar-

---

[1]The opinion does not indicate whether plaintiff objected to the evidence or otherwise moved to exclude it.

gues that in any event, the facts in *Underhill* render it inapplicable to the case at bar.

Preliminarily, we note that while the *Griffith* court did indeed state, in a footnote, that it did not regard *Underhill* as controlling, it did not declare that the reasoning therein was unsound and, in fact, did not include any explanation for its determination. From a reading of the case, however, we think it reasonable to infer that the court did not consider *Underhill* controlling for either or both of two reasons. First, as noted earlier, *Underhill* was brought under section 2 of the Safety Appliance Act dealing with automatic couplers whereas *Griffith* was brought under section 11 requiring that railroads equip their cars with "efficient" hand brakes. Second, because *Underhill* was reversed on other grounds, the *Griffith* court's discussion of the propriety of the instruction at issue was not essential to the opinion, but was merely inserted, as the court itself explained, as guidance for the trial court upon remand.

■ Moreover, we do not agree with plaintiff's assertion that the reasoning expressed in *Underhill* reflects a misinterpretation of the law or that it is contrary to the weight of the authority. As stated previously, the cases hold that to recover under section 2 of the Safety Appliance Act, it is necessary for the plaintiff to show not only that a violation occurred, but also that there was a causal connection between the violation and the subsequent injury;[2] and while a finding of a violation is not dependent upon proof that the coupler was defective—but only that it failed to couple—where the plaintiff specifically alleges that such a defect was the cause of his injuries, evidence that an immediate inspection disclosed that the appliance was not defective is material, not to show a lack of negligence by the railroad, but on the issue of causation, *i.e.*, whether the injury occurred as plaintiff claimed it had. (See *Bardo v. Chicago River & Indiana R.R. Co.* (1967), 87 Ill. App. 2d 445, 231 N.E.2d 713; *Coleman v. Burlington Northern, Inc.* (8th Cir. 1982), 681 F.2d 542; *McGee v. Burlington Northern, Inc.* (1977), 174 Mont. 466, 571 P.2d 784.) As stated in *Dobson v. Grand Trunk Western R.R. Co.* (7th Cir. 1957), 248 F.2d 545, 547, "even if there was a defective appliance, if the jury found from the evidence that the defect *** had no causal con-

---

[2]Although the term "proximate cause" is frequently used in FELA and Safety Appliance Act cases, the Supreme Court has held that a plaintiff is not required to prove common law proximate causation, but only that his injuries resulted in whole or in part from a violation of the Act. *Crane v. Cedar Rapids & Iowa City R.R. Co.* (1969), 395 U.S. 164, 23 L. Ed. 2d 176, 89 S. Ct. 1706; see also *McCalley v. Seaboard Coast Line R.R. Co.* (1972), 265 So. 2d 11.

nection with the accident, then, the jury could not properly find a verdict in plaintiff's favor insofar as the Safety Appliance Act was concerned."

■ Here, since the theory of plaintiff's case was, in essence, that the drawbar was somehow defective in that it became stuck in a misaligned position after the unsuccessful coupling maneuver and that it was during his attempt to dislodge the bar from that position that he was injured, we see no reason why competent evidence offered for the limited purpose of rebutting plaintiff's testimony as to how his injury occurred should not be presented for jury consideration. We emphasize, however, that while such evidence may be material to the issue of causation, it must nevertheless be competent in the first instance. In our view, the post-occurrence inspection evidence offered by defendant in this case lacked proper foundation and was, therefore, properly excluded.

A review of the record reveals that in addition to his argument that the inspection findings were irrelevant under the Safety Appliance Act, plaintiff also argued that defendant had failed to show that the condition of the boxcars and the coupling mechanisms thereon were the same at the time of the inspection as they were at the time of the accident, $9\frac{1}{2}$ hours earlier, and that for this reason the evidence lacked any probative value.

Defendant suggests that it was precluded from presenting such evidence, asserting in its brief that "when [its] trial counsel specifically sought a ruling on any foundation point (so that any foundation lack perceived by the plaintiff could be cured), the trial court made it clear that he would allow the evidence over a foundation objection [but] adhered to his ruling that regardless of foundation, the evidence was still inadmissible because of the [Safety Appliance Act] cases cited in plaintiff's motion *in limine*," and that "plaintiff's foundation argument is therefore contrary to the trial court's own ruling on that issue."

In our opinion, this argument of plaintiff is wholly without merit. First, we do not agree that the trial court "made it clear" that it would allow the inspection evidence over plaintiff's foundation objection had it not found it to be inadmissible under the Safety Appliance Act. To the contrary, the court expressed numerous concerns during the discussion on defendant's offer of proof regarding the absence of evidence showing that the conditions on track 2, including the location and condition of the cars, had not changed during the $9\frac{1}{2}$ hour interval between the accident and the inspection, commenting, at one point with reference to that interval, "a lot of questions arise in my

mind."

In any event, it is fundamental that since the question on review is the propriety of the judgment rather than the reasons given therefor, the judgment may be sustained on any grounds warranted, whether or not they were the ones relied upon by the trial court. *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 457 N.E.2d 9.

■■ "The general rule is that testimony based on an inspection of a physical object, after an incident involving that object resulted in injury, is not competent unless evidence is also introduced showing that the conditions inspected had remained unchanged in the interim." *Escher v. Norfolk & Western Ry. Co.* (1979), 77 Ill. App. 3d 967, 972, 397 N.E.2d 8, 13, *aff'd* (1980), 82 Ill. 2d 110, 411 N.E.2d 864; *Canales v. Dominick's Finer Foods, Inc.* (1981), 92 Ill. App. 3d 773, 416 N.E.2d 303; *Check v. Avco Lycoming Division* (1977), 56 Ill. App. 3d 217, 371 N.E.2d 994.

Here, in its best light, the testimony of defendant's employees is inconclusive as to whether the conditions on track 2 had been altered during the 9½ hours at issue and, in fact, two of defendant's witnesses actually contradict its assertion that there had been no changes in the location and condition of the boxcar during that time.

For example, although John Schall, the trainmaster, testified that when he inspected the boxcar at 10 a.m., it was situated about four to five car lengths from the south end of track 2 and, to his knowledge, had not been moved since the accident, he acknowledged on cross-examination that he could not be certain it was not moved since he was not at the yard the night before, having stopped there only briefly to transport plaintiff to and from the hospital, after which he went home—at about 3:30 a.m.; and that between 3:30 and 9 a.m. when he reported back to work, the night crewmen had finished their shift and two new day crews had already begun working. In contrast, Wise testified that while the B & O car remained on track 2 the remainder of that night, he noticed, when he left the yard at about 5 a.m., that it had been pushed further down the track from where it had been earlier.

Schall also stated that the car was not coupled to any others at the time of the inspection and that he did not recall which way it was facing. On the other hand, both Stanley Michel and John Workman, who each confirmed Schall's testimony that the boxcar was uncoupled when they inspected it, did recall which direction the car was facing. Stanley Michel testified that the B-end was facing south; Workman testified that it was his understanding that plaintiff was in-

jured adjusting the A-end of the car and that, as indicated in the written report he prepared immediately after the inspection, the A-end was facing north.

Although defendant now argues that "plaintiff's testimony about which end of the car was involved in the occurrence was dependent solely on his own credibility," we note (1) that at no time prior to this appeal did it challenge that testimony, which was fully corroborated by Wise and consistent with the information he (plaintiff) related to Schall shortly after the accident—that he was injured on the north end of the car—and with Workman's report which, contrary to his testimony, indicates that the B-end was facing north; and (2) that regardless of which direction the car was facing at the time of the accident, the fact remains that defendant failed to establish that it was in the same position when it was inspected. Indeed, notwithstanding the numerous contradictions in the evidence on the point, the testimony of defendant's employees that the B & O car was not attached to any other cars at 10 a.m. in itself indicates that an uncoupling procedure had taken place on track 2 sometime after the accident and tends to refute defendant's assertion that the cars were not "switched" or moved until later that afternoon.

Defendant further argues, however, that plaintiff's foundation objection does not apply to Schall's testimony regarding the absence of fresh scratch marks on the drawbar because such marks "would not have been affected by the short passage of time or any movement of the car." We cannot agree, noting first that despite the purported significance of this finding, Schall conceded on cross-examination that he had not noted it in the report prepared at the time of the accident. Moreover, in our view, the probative value of this finding was negated by the absence of any evidence in the record as to whether the car to which the B & O car had allegedly failed to couple had also been inspected and what, if any, damage was or would likely have been caused to it upon impact with the B & O coupling mechanism. We therefore conclude that the proffered evidence relating to the post-occurrence inspection was inadmissible as lacking in proper foundation.

■ Defendant's final contention is that even absent this evidence the remainder of Schall's testimony was sufficient to rebut plaintiff's version of the occurrence and to preclude the direction of the verdict in his favor.

On direct examination, Schall testified, in response to a hypothetical question, that assuming that the two cars involved were 4 to 5 feet apart on a straight track with the drawbars centered and the

knuckles open and that the engine reached a speed of no more than two miles per hour in pushing the cars together, it was his opinion that the drawbars would not "bypass" or become misaligned even if they failed to couple but, rather, would bounce back apart or remain together, but unlocked.

We note, however, that according to plaintiff's uncontroverted testimony, in order to be seen by the engineer, it was necessary for him to step a few feet away from the track because it curved eastward. Thus, contrary to defendant's assertion, Schall's opinion was not based on "the facts of the accident as presented by plaintiff's own testimony." Furthermore, nothing in Schall's response to the hypothetical question contradicted that portion of plaintiff's testimony in which he stated that in his experience coupling other cars, a "jolting" action caused by the enormous weight of the cars being pushed together can cause the drawbar to skew off center; and, in fact, Schall acknowledged on cross-examination that depending on the rate of acceleration and braking, the force of such weight could push the drawbar out of alignment.

In sum, we do not believe that the evidence presented by defendant, even when viewed in its most favorable light, was sufficient to rebut plaintiff's version of the occurrence or to create a question of fact for the jury and, therefore, conclude that the trial court properly directed a verdict for plaintiff.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and PINCHAM, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

■ In its petition for rehearing, defendant posits that this court improperly acted as trier of fact by weighing the evidence and judging the credibility of the witnesses—accepting as true the testimony of plaintiff's witnesses and rejecting that of the witnesses it presented. Specifically, defendant argues that the fact that we found inconsistencies and contradictions "in the evidence" in itself requires reversal of this case and submission of the questions raised thereby to the jury.

A closer reading of the opinion indicates, however, that, in the passages to which defendant refers, the focus of our discussion was not on inconsistencies and contradictions *between* the testimony of the witnesses but, rather, on the fact that, even taken as true, the testimony of its own witnesses was "in its best light *** inconclusive" and indeed, actually contradicted "its assertion," "its theory" and "its contentions" that the conditions on the track remained unchanged during the time between the accident and the inspection. It is this matter—the absence of a sufficient foundation for the admission of the inspection evidence—which was the basis of our decision and which defendant has failed to squarely meet or overcome.

For example, defendant states that its witnesses "all placed the car at the same *approximate* location" at the time of the occurrence and the inspection. We do not believe, however, that merely placing the car in "approximately" the same location provided sufficient foundation for admission of the inspection evidence, particularly where there was testimony that the car had been "pushed further down the track" sometime between the accident and 5 a.m. Moreover, defendant's own witnesses also stated that at the time of the inspection, the subject car was standing alone on the track uncoupled from the cars which, it is undisputed, were present on the track at the time of the accident. This alone establishes that conditions on the track had been altered and, specifically, that the subject car had been involved in an uncoupling process.

Defendant's argument that even plaintiff's witness stated that "when he left the yard at 5 a.m. he was the last one to touch the coupler" is clearly without merit since the very fact that he left the yard establishes that he could not know if anyone else touched the coupler between the time of his departure and its 9 a.m. inspection.

Neither do we find the photographs submitted by defendant as a supplement to the record and marked by it to show where the boxcar at issue was located, and to indicate that the track is straight at that location, to be dispositive of the issue since, *inter alia*, they are not photographs of the accident scene itself but merely depict that portion of the yard where the accident occurred and were introduced for demonstrative purposes and as testimonial aids for the witnesses. Furthermore, whether or not the track was straight or curved at the point where the boxcar was situated, while significant to plaintiff's version of the occurrence, does not directly bear upon the fundamental issue of whether a proper foundation was laid for introduction of the inspection results.

In summary, defendant is, in effect, asking this court to do ex-

actly what it claims we may not do, *i.e.*, weigh the evidence and make a determination that the numerous inconsistencies it incorrectly states we found therein require reversal and remandment. However, it is our view that there is nothing in the petition which either fills in the foundational gaps in its own evidence to show what it failed to show at trial, *i.e.*, that neither the car nor the coupler had been altered, repaired, moved or in any other way changed from the condition they had been in at the time of the accident or overcomes the contrary evidence—presented, as we stated, through its own witnesses as well as plaintiffs'—that activity had occurred on the track with respect to the subject car when all the other cars, including the one to which the subject car was previously coupled and the one with which it had failed to couple, had been moved from the track at some time between the accident and the inspection. We therefore adhere to our previous findings and deny the petition for rehearing.

Petition for rehearing denied.

LORENZ and PINCHAM, JJ., concur.